Eleanor M. BENSON, James A. Travis,
Appellants,

v.

UNITED STATES of America.

No. 23859.

United States Court of Appeals,
District of Columbia Circuit.

Argued June 26, 1970.

Decided March 16, 1971.

Mr. Robert Sheriffs Moss, Washington, D. C., for appellant.

Mr. William S. Estabrook, III, Washington, D. C., of the Bar of the Supreme Court of New York, pro hac vice by special leave of Court, with whom Asst. Atty. Gen. Walters, Messrs. Lee A. Jackson and Crombie J. D. Garrett, Attys., Department of Justice, were on the brief, for appellee. Mr. Leonard J. Henzke, Jr., Atty., Department of Justice, also entered an appearance for appellee.

Before McGOWAN, ROBINSON and MacKINNON, Circuit Judges.

PER CURIAM:

This appeal, brought by the co-owners of real property situated in the District of Columbia, is from the District Court's adverse disposition of their suit to quiet title to that property. Their action, seeking a decree that their property is not subject to a federal tax lien filed by appellee, raises a serious and novel question with regard to the form in which this jurisdiction recognizes the common law estate of tenancy by the entirety. For the reasons hereafter stated, we reverse the decision of the District Court.

The facts are not in dispute. Appellants, James A. Travis and Eleanor M. Benson (formerly Eleanor M. Travis), were married in 1944. In 1959 they acquired as tenants by the entirety two lots in the District of Columbia. Appellants' subsequent transactions with reference to this property have created the controversy in this case.

Early in 1961 appellants separated and, in May of that year, entered into a formal property settlement agreement. Central to the settlement was appellants' agreement to continue to hold the property as tenants by the entirety notwithstanding a future decree of divorce. Travis was to manage the property and pay a specified sum ($215 per week) to Benson during the minority of their children. Insofar as possible that amount was to be paid out of the net income from the property. If the $215 figure exceeded one-half of the net income, the excess would be considered support and maintenance paid by Travis. After all the children attained majority (the agreement called for the payment plan to remain in effect for 23 years rather than for 21, apparently providing a 2-year cushion) Benson would be entitled thereafter to one-half of the net income.[1]

The stated purpose of this arrangement was "to provide the wife with an independent income so long as she may live * * * and to permit her to meet the obligation * * * to support, maintain and educate the minor children of the parties" (of which there were eleven). Appellants obtained a divorce by a Maryland decree dated August 4, 1962, which did not mention the property settlement agreement. Travis remarried shortly thereafter.

Approximately 18 months after the settlement agreement had become effective, Travis, being in default on notes secured by three deeds of trust against the property, began to search for a method of refinancing the property.[2] Since his credit would not support a loan, his second wife's parents (Donald and Olive Crawford) agreed that the loan could be taken out in their names. In appellants' own words, the Crawfords "agreed to lend them [Travis and his second wife] credit."

The refinancing was carried out in several steps. By deeds dated January 16, 1963, appellants deeded the real estate to the Crawfords as tenants by the entirety (referred to as the "deed out") and simultaneously the Crawfords reconveyed it to appellants by a separate deed (referred to as the "deed back"). The deed back purported to reconvey the property to appellants in exactly the same form in which it had been held at all times since its acquisition, i. e., as tenants by the entirety. Both deeds were executed and delivered on the same day. Still pursuant to their prearrangement, the deed out was recorded on January 31, 1963 and the Crawfords obtained a $41,000 loan secured by a new first deed of trust on the property, which was executed on March 10. With the proceeds of the loan, Travis's outstanding debts were paid off and, once

1. The agreement further stipulated that the property could not be sold or encumbered unless both parties agreed.

2. Travis was also in default on payment of federal income taxes for which both

he and appellant Benson were liable. A federal tax lien (unrelated to the tax lien in issue on this appeal) for approximately $2,000 was filed against property owned by them in Maryland.

the refinancing was completed, the deed back was recorded on April 23. Correspondence passing from Travis to Benson at the time makes clear that both appellants understood that the sole purpose of this deed arrangement was to place a loan on the property and that it would "in no wise or manner affect or modify [the] property settlement agreement or [Travis's] obligations and responsibilities * * * under said agreement."

■ The Government's interest in this case arose in March, 1964, when the Internal Revenue Service assessed a 100 percent penalty against appellant Travis in the amount of $28,461.79 pursuant to Section 6672 of the Internal Revenue Code. The assessment grew out of Travis's activities as an officer of a Maryland-based electrical contracting company. The amount of the penalty was equal to the amount of federal income withholding and social security taxes allegedly withheld by the company in 1959–1960 but not turned over to the Government. On March 23, 1964, a federal tax lien in the amount of the unpaid assessment was filed by the Government against appellants' property. The District Court was not called upon to rule on the substantive merit of the assessment but was only presented with the question whether this lien for a separate debt of appellant Travis could attach to the property in question.[3] The case was heard on cross-motions for summary judgment, and the District Court found for the Government.

Appellants' primary assertion is that since the property is owned by the parties as tenants by the entirety it cannot be subjected to a tax lien representing the debt of only one of the tenants. The Government concedes that, if the property were being held by the entireties, the tax lien could not attach. *See* Alpher v. Preston, 142 U.S.App.D.C. 187, 440 F.2d 215, No. 22,507 (Feb. 23, 1971); American Wholesale Corp. v. Aronstein, 56 App.D.C. 126, 10 F.2d 991 (1926). Its contention is, rather, that the refinancing transactions destroyed the tenancy by the entirety and left appellants as joint tenants. The Government's theory is that the deed back, which purported to convey the property to appellants by the entirety, was legally ineffective for that purpose because appellants failed to satisfy the first prerequisite for such an estate—they were not married. *See, e. g.,* Coleman v. Jackson, 109 U.S.App.D.C. 242, 286 F.2d 98 (1960); Fairclaw v. Forrest, 76 U.S.App.D.C. 197, 130 F.2d 829 (1942), cert. denied, 318 U.S. 756, 63 S.Ct. 531, 87 L.Ed. 1130 (1943). And, based on the rule applied in this jurisdiction, an ineffective effort to establish an estate by the entirety creates instead a joint tenancy. *See* Cobb v. Gilmer, 124 U.S.App.D.C. 398, 365 F.2d 931 (1966); Coleman v. Jackson, *supra.*[4]

3. Although the Government concedes that the District Court has jurisdiction to hear suits to quiet title to real property against which a federal tax lien has been filed (28 U.S.C. §§ 1340, 2410), it contends that there is no jurisdiction in this case because appellants' suit is in reality an attack upon the *merits* of the tax assessment "through the guise of a quiet title action." *See, e. g.,* Falik v. United States, 343 F.2d 38 (2d Cir. 1965). We think that the Government's jurisdictional challenge is ill-founded since appellants nowhere question the merits of the underlying assessment.

4. *Compare* Sebold v. Sebold, 143 U.S.App. D.C. ——, 444 F.2d 864 (decided February 12, 1971). In *Sebold* the issue was whether upon *dissolution,* as distinct from an abortive *creation,* of a tenancy by the entirety, the parties held as joint tenants or as tenants in common. We held in the former that the divorced co-tenants became tenants in common. 143 U.S.App.D.C. —— – ——, 444 F.2d 870–872 and footnote 12. The distinguishing line between these two situations is clear. In the one, the court is seeking to effectuate the supposed intent of the parties to a deed by giving them the estate most similar to a tenancy by the entirety, *i. e.,* a joint tenancy with the right of survivorship. In the other, the concern is only with the resulting estate when a pre-existing valid estate by the entireties is destroyed by operation of law upon a decree of divorce.

As a joint tenant, Travis's one-half interest could be subjected to the payment of his individual debts.

The Government's argument focuses on the refinancing conveyances rather than upon the divorce and property settlement, recognizing, as we think it must, that, at least until such time after the divorce as appellants entered upon their program of refinancing, the property was legally held by them as tenants by the entirety. While at common law, and today in all jurisdictions other than our own which have retained this form of concurrent ownership, the existence of the marital relation is indispensable,[5] by statute in the District of Columbia it is possible for the parties to a divorce decree to retain any property interest they may have held as tenants by the entirety. Section 910 in pertinent part reads as follows:

> "Upon the entry of a final decree of annulment or absolute divorce, *in the absence of a valid antenuptial or postnuptial agreement in relation thereto,* all property rights in * * * tenancy by the entirety shall stand dissolved * * * and the court may * * * apportion [the property] in such manner as seems equitable, just, and reasonable."

16 D.C.Code § 910 (1967) (emphasis supplied).

■ The few cases construing this Section have adopted a reading which is consistent with its plain wording. In Heath v. Heath, 89 U.S.App.D.C. 68, 69, 189 F.2d 697, 698 (1951), the court determined that "[t]his section of the code permits a husband and wife to retain the incidents of a tenancy by the entirety * * * after their marriage is dissolved if they so agree." The court further found that a property settlement agreement was a sufficient vehicle for the preservation of such a marital estate. *See also* Hardy v. Hardy, 250 F. Supp. 956, 959 (D.D.C.1966). It is clear then that, as the property was initially acquired by the parties during coverture, the property settlement agreement was adequate under the statute to preserve the parties' estate by the entirety after the Maryland divorce.[6]

The only substantial issue then is whether the subsequent refinancing transactions operated to terminate appellants' statutory right to utilize this particular form of concurrent ownership. Stated differently, the question turns on the degree to which the existence of the statute mitigates the inflexibility of the common law maxim that persons who are not man and wife may not acquire property as tenants by the entirety. The maxim derives from common law fiction of marital unity which viewed husband and wife as but one person.[7] With the advent and proliferation of married women's property acts, the marital unity fiction has disappeared; and with it has gone the tenancy itself in over half of the States. In this and other jurisdictions in which the estate by the entirety is still recognized, however, it has enjoyed continued vitality because of the several beneficial incidents this estate offers to its owners. Among the most significant preferential incidents are those enumerated by this court in Alpher v. Preston, *supra* at 218 "[a] unilaterally indestructible right of survivorship, an inability of one spouse to alienate his interest, and * * * a broad immunity from claims of separate creditors. * * *" In no jurisdiction, save our own, have these favorable attributes been made available, either judi-

---

5. *See generally* 4 R. Powell, Real Property § 622 (1968); C. Moynihan, Law of Real Property 229–235 (1962).

6. Whether the divorce was local or foreign is inconsequential in determining whether a postnuptial agreement satisfies the statute. *See* Heath v. Heath, 89 U.S.App.D.C. 68, 189 F.2d 697 (1951) (Flori-

da divorce); Hardy v. Hardy, 250 F. Supp. 956 (D.D.C.1966) (Maryland divorce).

7. *See* Huber, Creditors' Rights in Tenancies by the Entireties, 1 B.C.Ind. & Com. L.Rev. 197, 199 (1960); Ritter, A Criticism of the Estate by the Entirety, 5 U.Fla.L.Rev. 153, 155 (1952).

cially or legislatively, to classes of persons other than presently legally married couples: The common law maxim, even without its fictional justification, has been consistently and rigidly applied.

The unquestionable effect of the statute in question here has been to create one small but logical exception to the rigid common law limitation by establishing a narrow class of co-owners of property who could hold by the entirety. Section 910's scope encompasses only those who (1) acquired the property as tenants by the entirety during coverture, and (2) explicitly agreed prior to their divorce to continue to hold it in the same form. Considerable research has failed to disclose any illuminating legislative history.[8] In the absence of evidence of explicit legislative purpose, we can only surmise as to the considerations which prompted the passage of Section 910.

The fact that Congress has retained tenancies by the entirety for the District of Columbia at all indicates, we think, a preference for marital community interests over the often competing interests of creditors. Due to the tenancy's core incidents of inalienability and immunity from claims for separate debts, the owners may enjoy the assurance of a relatively sheltered source of support for the marital estate.[9] The promulgation of this statute, which permits the tenancy by the entirety to continue after the dissolution of the marriage, seems a logical extension of the tenancy in recognition of the fact that a formal decree of divorce often does not dissolve interspousal support obligations. The case before us offers an appropriate

example and most probably represents the rule rather than the exception. Since Travis's responsibility to provide for his ex-wife and children outlived the divorce, the parties agreed that certain property should be set aside and devoted to the fulfillment of those obligations. The statute, by allowing them to hold that property as tenants by the entirety, guarantees that the chosen source of income cannot be depleted through unilateral alienation or attachment by creditors to satisfy the separate debts of either party.

The statutory exception to the common law tradition is a narrow one. Obviously, it does not apply to property *newly acquired* by divorced parties; and, if we were convinced that as a result of appellants' refinancing conveyance, any new or enlarged property interest was acquired by them, we would be compelled to affirm the District Court. Certainly it is true, as that court found, that there was a conveyance to Benson and Travis and that they were unmarried at the time. For us to rule, however, on the basis of those two facts alone that appellants acquired any new or different interest in property not susceptible of ownership by the entirety would be to disregard the practical effect of these transactions.

Travis was heavily in debt and his credit would not support the borrowing necessary if the property was to continue to serve the purposes of the settlement agreement. One alternative, and the one he pursued, was to put record title to the property in someone whose credit would support the requisite loan. But, because of his ex-wife's concurrent interest, he could not convey

8. Upon request by the panel at oral argument, the parties undertook a thorough re-examination of the legislative history of this statute. The scanty materials available, which their research uncovered, failed to shed light on the Congressional intent underlying the passage in question. The Section appears to have been a minor part of a larger bill introducing various new grounds of divorce. What few references there are regarding this Section indicate that its primary purpose was to authorize the court to apportion property among the parties to the divorce in such manner as it saw fit. *See* S.Rep.No.720, 74th Cong., 1st Sess. 2 (1935).

9. *See* Fairclaw v. Forrest, 76 U.S.App. D.C. 197, 200–201, 130 F.2d 829, 832–833 (1942); Huber, *supra* note 7, at 205.

away or encumber the property without her consent.[10] The incident of inalienability stood in his way, and his ex-spouse would not go along unless she could be assured that no alteration of the status quo would result from the transaction. Travis agreed, and their correspondence as well as the deed back, which was executed and delivered simultaneously with the deed out, reflect that no modification of existing relationships was contemplated. Travis continued to remain in possession and to manage the property, and Benson's right to periodic payments out of the net income of the estate continued unabated. In short, appellants have been the uninterrupted beneficial owners of the property since their initial acquisition of it in 1959. Recognizing that appellants have not been engaged in any postcoverture new acquisitions, we find that they still hold the property as tenants by the entirety and that, therefore, the federal tax lien can not attach.[11]

We think this case is closely analogous to Alpher v. Preston. There husband and wife held realty as tenants by the entirety. There, as here, the husband was confronted with serious financial problems. With foreclosure on the realty threatened, the couple entered upon a plan whereby the property was sold and the proceeds were placed on deposit as "substituted security for an indebtedness previously secured by the lien of a deed of trust on the realty." Upon the husband's death, the creditors of his estate sought to establish a one-half interest in the deposited fund.

The position there taken on behalf of the marital community was that the fund was held, as was the pre-existing realty, as tenants by the entirety and that, therefore, it was immune from separate creditors' claims. This contention rested squarely on the proposition that "an estate by the entireties pre-existing in particular property continues automatically in its derivatives on disposition." The court's discussion of this attribute of tenancies by the entirety is instructive:

"In this jurisdiction, the rule has been given specific application, in a situation similar to that now presented, over the protests of separate creditors.

This, we think, is as it should be. The rule continuing in derivatives the estate previously subsisting in the realty subserves the policy justifying present-day ownership by the entireties and enjoyment of its related inci-

---

10. Travis was also barred by the terms of the property settlement agreement from conveying without Benson's assent, but even in the absence of such a clause, as a tenant by the entirety he could not convey without her signature.

11. Appellants have argued that through these transactions a resulting trust was created. They contend that under the circumstances here the conveyance to the Crawfords as "straw" parties gave them merely "naked" legal title, the beneficial interest remaining at all times in the transferors. *See* 5 A. Scott, Trusts § 404 (3d ed. 1967). We do not think it necessary to the resolution of this case to rely on appellants' resulting trust theory. Indeed, on these facts the conveyance away with a definite agreement to reconvey more closely resembles an express or constructive trust. We might be faced with the need to rely on one of these trust theories if, for instance, the Crawfords had taken under the deed out and later refused to reconvey or if the mortgagee who made available the $41,000 loan was here claiming that it had been fraudulently obtained. Such fact situations would raise questions as to *who* has an interest in the property, which is not the issue in this case. Since the only issue here concerns the *nature* of appellants' present ownership, it is enough to point out that through the conveyance out appellants never gave up the physical enjoyment of the property and that the deed back did not create any new property interest.

It should also be noted that as between the Crawfords and appellants neither legal nor equitable title was interrupted by the simultaneously delivered deeds. The deed back as well as the deed out became effective contemporaneously when delivered rather than on their respective dates of recordation so that there was never a span of time during which appellants were without legal title. *See* 45 D.C.Code § 501 (1967).

dents. \* \* \* *And since the estate in the derivative is an extension of the estate, and not an interest newly created, the rule does not operate to alter, one way or the other, the rights of existing creditors. \* \* \* "*

Alpher v. Preston, *supra,* 142 U.S.App. D.C. at ——, 440 F.2d at 220 (emphasis supplied.)

While in *Alpher* the parties were married at the time of the sale, we do not think, in view of Section 910, that that fact should be determinative. That Section, in extending the estate when the parties have agreed before the date of divorce to continue to hold by the entirety, necessarily extended the incidents of that estate, including this favorable one of continuation of the estate into its derivatives upon disposition. Therefore, if Travis had, for instance, sold the property and segregated the proceeds, or exchanged the property for other property, we would not hesitate to invoke the teaching of *Alpher*. We are able to see no difference in substance between such changes in the form of the derivative of the estate and the refinancing conveyances which took place here. Neither involves an "interest newly created" but is merely an "extension of the estate." Neither type of transaction operates "to alter, one way or the other, the rights of existing creditors." Logic compels the same result *vis a vis* creditors in both cases.

Of course, if these conveyances had operated to defraud the Government we would be swift to strike them down as we would any conveyance designed to "hinder, delay or defraud creditors." [12] The Government has made no such claim nor do we see how it could. On the uncontroverted facts before us, we do not think that appellants' refinancing transactions changed the nature of their estate from a tenancy by the entirety to a joint tenancy. Their realty is, therefore, immune from the Government's tax lien.[13]

The judgment of the District Court is reversed and the case remanded with directions to enter judgment in appellants' favor.

It is so ordered.

---

12. 28 D.C.Code § 3101 (1967); Alpher v. Preston, 142 U.S.App.D.C. ——, 440 F. 2d 215, No. 22,507 (Feb. 23, 1971).

13. Appellants have also pursued the independent contention that the Government's

assessment was wiped out by Travis's discharge in bankruptcy in 1965. Having determined that the lien did not attach in the first instance, it is unnecessary for us to pass on this issue.